EDELMIRO RODRÍGUEZ RIVERA, Petitioner, *v.* COMMITTEE FOR THE SETTLEMENT OF MUNICIPAL COMPLAINTS ET AL., Respondents.

No. 2. Decided December 5, 1961.

*Benjamín Ortiz* and *Angel Viera Martínez* for petitioner. *Hiram R. Cancio, Secretary of Justice (José C. Aponte, Baldomero Freyre, Special Prosecuting Attorneys at Large, Juan Lorenzo Rodríguez,* and *Gerardo Méndez Correa, Special Prosecuting Attorneys,* on the brief) for respondents.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Rigau.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

On March 17, 1959 the Committee for the Settlement of Municipal Complaints issued an order directing the removal of Edelmiro Rodríguez Rivera from his office as mayor of the Municipality of Aibonito, upon granting the first of four charges preferred against him by the Governor of Puerto Rico, through the corresponding complaint. Respondent appealed from this order by way of the certiorari provided by paragraph 10 of § 29 of the Municipal Law of 1928 (21 L.P.R.A. § 132), as amended by Act No. 4 of December 7, 1955 (Sp. Sess. Laws, p. 62).[1]

The facts alleged in the charge found proved and which in the Committee's opinion "constitute *illegal action* on the part of the respondent," were: (1) having appropriated to himself and disposed of by means of donation or sale, without authorization from any municipal body, useful surplus construction material proceeding from the demolition of several buildings in the ward El Coquí of Aibonito, which had been granted by the Housing Authority of said municipality; (2) having collected approximately $1,677.50 from the sales of the aforesaid materials, which he did not enter in the municipal funds and of which he gave no notice either to the auditor or to the treasurer of the municipality, and which he used in the manner he deemed most convenient; (3) failure to give notice to any officer or municipal agency, of the official steps taken by him in procuring that the aforesaid

---

[1] The above-mentioned paragraph reads as follows:

"(10) In the event of his removal the mayor shall have the right to appeal to the Supreme Court of Puerto Rico within the term of ten (10) days following notice of the decision, for a finding as to whether or not removal was justified. Said finding shall issue through writ of certiorari, and the findings of fact of the committee shall be final."

The above-mentioned § 29 was completely incorporated in the new Municipal Law, effective January 9, 1961: Act No. 142 of July 21, 1960, § 37 (Sess. Laws, p. 505), 21 L.P.R.A. § 1256.

materials be granted to the municipality for the execution of works of public interest. The commission of seven errors is assigned.

1, 2 The facts constituting the charge previously transcribed occurred prior to December 7, 1955, effective date of Act No. 4 creating the Committee for the Settlement of Municipal Complaints, a body empowered to hear and make decisions on the charges preferred against a mayor "for immoral conduct or unlawful acts in the performance of his functions." Respondent maintains that the Committee erred upon applying said Act retroactively, that is, considering facts occurring prior to its effectiveness as cause for removal.

It is unnecessary for us to consider all the contentions made by respondent with respect to this alleged error. Under the Act in force at the time of the commission of the acts constituting the charge preferred—§ 29 of the Municipal Law of 1928, as amended by Act No. 55 of April 18, 1950 (Sess. Laws, p. 138)—as well as under the same provision as subsequently amended by Act No. 4 of December 7, 1955, the "unlawful acts in the performance of (the) functions" in the office of mayor constitute sufficient cause for the removal to be ordered. It is unnecessary then, that we decide whether the change from "gravely immoral" conduct (Act No. 55 of 1950, *supra*) to just "immoral" conduct (Act No. 4 of 1955, *supra*) placed the petitioner in a more serious position. The decision separating him from office was not based on this ground. The respondent Committee only had to determine whether petitioner's conduct submitted for examination and investigation constituted "unlawful acts."

The charge that the statute does not provide an adequate test to determine the immoral conduct which might cause removal need not be considered either in view of the reason stated that the removal of respondent in the instant case was due to his unlawful acts. Even at the risk of incurring tautology, unlawful acts are merely conduct contrary to law.

In this respect, in the charge preferred by the Governor, after describing the acts charged, reference was made to the specific provisions of the Act allegedly violated,[2] thus placing respondent in a position to prepare an adequate defense.

3, 4 The third and fourth errors challenge the removal because (a) even accepting the findings of fact set forth by the Committee, these are not sufficient if, as concluded, the petitioner did not obtain profit nor personal benefit as a consequence of the facts found proved; and (b) it was not shown that any of the transactions made by the petitioner exceeded the sum of $200 as required by § 8 of the Municipal Law of 1928, 21 L.P.R.A. § 34, and furthermore, the sections of the Regulations of the Municipal Accounting System which it is suggested were violated, did not impose duties on him personally but on other municipal officers.

In order to dispose adequately of these contentions, we copy the Committee's findings of fact in Appendix "A" of this opinion. Upon doing so, we wish to repeat that by express provision of the law "the findings of fact of the Committee shall be final," and that there is not the slightest intimation that those set forth are not sustained by the evidence.

█ █ The absence of personal benefit for the officer removed does not necessarily entail the acquittal from the charges set forth. We have so stated in similar situations. In *In re Fonseca*, 42 P.R.R. 189 (1931), we upheld the removal of the mayor decreed by the municipal assembly by virtue of charges to the effect that said officer had leased a

---

[2] The first count, after describing the acts charged to Mayor Rodríguez, ends:

"Upon so acting, Edelmiro Rodríguez Rivera violated the provisions of the Municipal Law and of the Regulations of the Municipal Accounting System applicable to the case, especially § 8, paragraph 5 of the Municipal Law, and §§ 31(3), 40, 44(a), and 46(a) of said Regulations by unlawfully, wilfully, and maliciously depriving the Municipality of Aibonito of personal property consisting of materials granted to the Municipality of Aibonito and of the afore-mentioned amount of $2,836, which he used for purposes alien to their legitimate administration."

portion of the market place, in the face of a municipal ordi-. nance requiring the intervention of the assembly for that purpose, and had also disposed of sixty dollars received by him as rent and failed to deposit the same in the municipal treasury without considering the fact that respondent did not convert them to his own use, for in any event, "the misuse of money belonging to the municipality cannot be excused." The absence of the intention to defraud does not constitute a valid defense when the action charged is clearly contrary to law, *Municipal Assembly* v. *González, Mayor*, 55 P.R.R. 526 1939). See, *Winship, Governor* v. *Municipal Assembly*, 55 P.R.R. 439 (1939) ; *Piñero, Governor* v. *Barreto*, 68 P.R.R. 136 (1948) ; *Piñero, Governor* v. *Grillasca*, 67 P.R.R. 853 (1947).

 Even though the evidence showed that a great deal of the materials and of the funds received from said sale were used for the construction of distribution centers of milk in the rural zone of the municipality and others for the community, "the truth is that the request for the granting of said materials was made to the Housing Authority of Puerto Rico by respondent, *in his official capacity* as mayor of Aibonito, and that the materials were not granted by the Authority to the respondent in his individual private capacity, but in his official capacity as mayor of Aibonito." (Italics ours.) Therefore, the property in question was municipal property for the disposal of which he should have strictly followed the procedure provided by law and with which respondent was undoubtedly acquainted, because he had been acting as mayor thereof since 1944. The conduct of Mayor Rodríguez is in contravention to the provisions of paragraph 5 of § 8 of the Municipal Law then in force,[3] and constitutes the "unlawful

---

[3] The afore-mentioned section reads as follows:

"No municipal property may be sold, leased, mortgaged, encumbered or otherwise disposed of except on public sale, unless otherwise expressly authorized by this subtitle, and no such property shall be exchanged except by resolution of two-thirds of the entire membership

acts" to which the law refers as cause for removal. The only way in which we could exonerate him would be if we decided that the Housing Authority granted the materials to Rodríguez in his personal capacity, if this were possible, but we are stumped by the definite findings of fact on the matter set forth by the Committee, which are supported by the evidence presented.

Neither is the petitioner correct upon averring that the evidence did not show that any of the transactions were made for a sum greater than $200 in order to find refuge in the exception contained in the afore-cited section, that public call for bids will not be necessary to dispose of municipal property when its real and effective value is less than the aforesaid sum. The Committee made specific findings as to the existence of sales to Juan Negrón Colón and to Juanita Rosado Dávila for $225 and $200, respectively (see Findings of Fact No. 11). As to the other sales, the requisite that the value of less than $200 would be determined by the Secretary of the Treasury and shall be posted on the bulletin

---

of the municipal assembly; *Provided, however,* That the requisite of public call for bids shall not apply in cases of any movable property of the municipality, whose real and effective value or residual value is less than two hundred (200) dollars; *Provided,* That said value shall be determined by the Secretary of the Treasury of Puerto Rico and shall be posted on the bulletin board of the town-hall or municipality; *Provided,* That whenever any of these negotiations may be entered into by a municipality with the Government of the United States of America, or with any of its agencies, dependencies, or instrumentalities, or with the Commonwealth of Puerto Rico, or with any of its agencies, dependencies, or instrumentalities, there shall be no need for a public call for bids, but said transaction must be approved by the Governor of Puerto Rico upon recommendation of the Secretary of Justice of Puerto Rico as to the legal aspect of said transaction; *Provided, further,* That if any of these transactions or negotiations has been entered into between any municipality and The People of Puerto Rico, or between any municipality and the People of the United States, it shall hereby be validated *ipso facto.* Notwithstanding the foregoing, nothing shall prevent a municipality, upon regulation for the purpose prepared by the municipal assembly and approved by the Secretary of the Treasury of Puerto Rico, from leasing movable property of the municipality for a reasonable rent."

board of the town-hall was not complied with. It also appears that no explanation was given as to the disposal of $179.50 from the proceeds of the sales effected, for while the sales were established for $1,677.50 (Findings of Fact No. 15) only the amount of $1,498 was justified in donation. (Findings of Fact No. 17.)

■■ The petitioner is wrong in indicating that the provisions of the Regulations of the Municipal Accounting System approved on January 14, 1949, which it was decided had been violated, were not in force at the time of the events. It is sufficient to say that even if § 20 of the Organic Act of 1917—under whose provisions said Regulations were drafted and promulgated by the Auditor—was rendered ineffective by the Federal Relations Act, Act No. 10 of July 24, 1952 (Sp. Sess. Laws, p. 22) approved in order to implement the changes introduced upon the creation of the office of the Controller, transferred to the Department of the Treasury "all the duties, powers, and functions which by law, *regulation*, executive order or ordinance appertain to the Office of the Auditor or to the Auditor at the time this Act is approved and which have not been assigned to the Office of the Controller by virtue of Section 22 of Article III of the Constitution of the Commonwealth of Puerto Rico or of the Act to create and organize the Office of the Controller of Puerto Rico." (Italics ours.) Since the facts referred to in the complaint occurred prior to 1957, it is unnecessary to decide whether the failure to file said regulation within the three months after June 30, 1957, as required by § 5 of Act No. 112 of June 30, 1957, known as the Rules and Regulations Act of 1958 (3 L.P.R.A. § 1045), causes the same to be void.

■ We wish to indicate that respondent's conduct does not constitute mere technical violations of legal provisions but it presents clear contempt of one of the most important provisions in municipal government—sale or alienation of the property of the community. Undoubtedly, this regula-

tion serves the purpose of obtaining orderly public administration and to prevent that the disposal of municipal property be led by judgments contrary to the best practice. If we sanctioned the conduct involved herein we would be dangerously opening a door to an officer who in his desire to remain in office indefinitely could sell or lease public property under the most advantageous terms for his own political position, with possible detriment to the best interests of the community in general.

Even though within a sphere of activity limited to the municipality, the mayor in Puerto Rico has an important and delicate mission. It is his responsibility to direct and guide public management within the standards of strict order and irreproachable integrity. We have been fortunate that up to the present we have been able to depend on men and women who have uprightly observed these rules of conduct. To uproot practices which tend to undermine the standards stated constitutes a full acknowledgment of this magnificent work.

5 The facts which gave rise to the removal of respondent occurred from 1952 to 1955. In the general elections held in November 1956, Rodríguez was re-elected to the office of mayor of the Municipality of Aibonito. He maintains that this re-election excused and condoned the acts formerly described as unlawful by the Committee and therefore, the removal does not lie.

■ This Court, since 1938, in *Winship, Governor* v. *Municipal Assembly*, 53 P.R.R. 131, 139, held that a mayor may be removed during a term of a new administration for which he has been re-elected, for acts done during his previous administration. After explaining that there was no unanimous judgment on this question, we stated that "weighing the reasons adduced on one side and the other, the sounder and more effective doctrine seems to us to be that which holds that the impeachment lies." And thus it is in fact. Within the

most sound rules of administration of public property, the solution required must guarantee the purety of the acts of officers and employees. Public administration requires that in this respect we sanction a rule that will guarantee any course of action within the quintessence of decorum and morality.

Appellant insists that the ratio decidendi in the *Winship* opinion was the absence of an investigation prior to the re-election, which would bring to the knowledge of the electorate the acts object of censure. We have carefully examined the text referred to and find nothing to sustain said position. Mr. Chief Justice del Toro, after adopting the afore-stated rule for this jurisdiction, cited as an example thereof, the words of the Supreme Court of Iowa in *State* v. *Welsh*, 79 N.W. 369 (Iowa 1899) for the clear purpose of showing that the main object of removal "is to rid the community of a corrupt, incapable, or unworthy official." The reference made that the offensive conduct may not have been discovered prior to elections is not the true basis on which said Court relied. On the other hand, the fact that respondent had been object of an investigation does not show that the voters had full knowledge of the results of said investigation or of the scope which is sought to be given to the re-election. In the same breath, we may add that the provision of § 29(2) under which respondent was removed—"for... unlawful acts in the performance of his functions"—is sufficiently ample to justify the consideration of acts committed during a previous term. *Stanley* v. *Jones*, 2 So.2d 45 (La. 1941); *Bolton* v. *Tulby*, 158 Atl. 805 (Conn. 1932); *Attorney General* v. *Pelletier*, 134 N.E. 407 (Mass. 1922); and especially, *Re Opinion of Justices*, 33 N.E.2d 275 (Mass. 1941), where it is stated that if the appellant's interpretation were sustained, the purpose of obtaining competent and trustworthy officers would fail to a considerable degree, it being further stated that the identity in the office and in the performance of its duties

demands that, in defense of the interests of the community, removal be ordered for acts committed prior to re-election. See, also, *Removal of public officer for misconduct during previous term*, 138 A.L.R. 753 (1942); 4 McQuillin, The Law of Municipal Corporations, § 12.238 (3d ed. 1949).

 6 Respondent alleges that the law under which he was removed is unconstitutional because the same body which decides on the property of the charges previously determines their sufficiency. To dispose of this allegation it will suffice to refer to our opinion in *In re Marín*, 81 P.R.R. 267 (1959). In relation to the procedure for removal of judges —this Court ordered the investigation, the filing of the corresponding complaint, and then decided the case on the merits—we stated that our participation in the preliminary state of the facts does not transgress the due process of law. Considering the facts referred to therein—the nature of the procedure, the degree of connection or contact of the adjudicating body, and the effects of his preliminary intervention as to its impartiality and desinterestedness—it is evident that the function of the Committee for the Settlement of Municipal Complaints in passing on the sufficiency of the charges preferred by the Governor of Puerto Rico does not disqualify it to render later a just and impartial judgment thereon, after having considered the evidence presented.[4] As a matter of fact, this function is similar to that of any court which considers a motion to dismiss for insufficiency of the allegations. No one would think of maintaining that the judge who determines the sufficiency of a complaint is later precluded from hearing and deciding the case on the merits. See, *People v. Quiles*, 83 P.R.R. 61 (1961) and *People v. Pacheco*, 83 P.R.R. 275 (1961).

Specifically, in *Mangual v. District Court*, 60 P.R.R. 802 (1942), which concerned a proceeding for removal filed by

---

[4] It is convenient to note that of the four charges preferred, whose sufficiency was initially sustained, the Committee dismissed three after receiving the evidence of the parties.

a mayor against the secretary-auditor, we held that the fact that a mayor prefers the charges and has previous knowledge of the facts in controversy, is no ground for disqualification to conduct a hearing on the same, in absence of a showing of bias and prejudice. And in *Municipal Assembly* v. *González, Mayor*, 55 P.R.R. 526 (1939), we held that the mere fact that some assemblymen preferred charges against the mayor is not sufficient motive in itself to disqualify them as judges in the matter, unless some cause is shown why they should not act as such. *Cf. Rivera* v. *Labor Relations Board*, 70 P.R.R. 5 (1949). In general, see, 4 McQuillin, *op. cit.*, § 12.259.

 7 Finally, respondent maintains that, pursuant to § 21, Art. III of the Constitution of the Commonwealth of Puerto Rico,[5] the power to remove mayors belongs exclusively to the Legislative Assembly and that the same cannot be validly transferred to any other body even of its own making. The limited references in the history of this constitutional provision which appear in the Journal of Proceedings of the Constitutional Convention, far from strengthening

---

[5] Said section reads as follows:

"The House of Representatives shall have exclusive power to initiate impeachment proceedings and, with the concurrence of two-thirds of the total number of members of which it is composed, to bring an indictment. The Senate shall have exclusive power to try and to decide impeachment cases, and in meeting for such purposes the Senators shall act in the name of the people and under oath or affirmation. No judgment of conviction in an impeachment trial shall be pronounced without the concurrence of three-fourths of the total number of members of which the Senate is composed, and the judgment shall be limited to removal from office. The person impeached, however, may be liable and subject to indictment, trial, judgment and punishment according to law. The causes of impeachment shall be treason, bribery, other felonies, and misdemeanors involving moral turpitude. The Chief Justice of the Supreme Court shall preside at the impeachment trial of the Governor.

"The two houses may conduct impeachment proceedings in their regular or special sessions. The presiding officers of the two houses, upon written request of two-thirds of the total number of members of which the House of Representatives is composed, must convene them to deal with such proceedings."

this interpretation weaken it. Upon delegate Veray's question as to the mandatory character of impeachment proceedings for the commission of felonies and their possible application to legislators, delegate Gutiérrez Franqui pointed out that this language did not refer to legislators but that "these are causes for the impeachment of *executive officers*" (p. 727). (Italics ours.) Furthermore, if there had been intention to include mayors among the officers whose removal was exclusively reserved for the Legislative Assembly, obviously it would have been expressly stated in the reports of the corresponding committee or in the debates of the Convention, considering especially that the classical practice up to this moment had been to entrust said function to the Governor or to the municipal assemblies.[6]

Similar provisions to § 21, Art. III of our Constitution have been interpreted which refer to certain specified officers, *State* v. *Sullivan*, 188 P.2d 592 (Ariz. 1948); *Lowrey* v. *Mayor, etc. of City of Central Falls*, 50 Atl. 639 (R.I. 1901), and in the case of those who have been elected at large. In other words, it has not been applied to officers elected by the limited vote of the voters of a municipality. *Attorney General* v. *Pellitier*, 134 N.E. 407 (Mass. 1922); *Attorney General* v. *Tufts*, 131 N.E. 573 (Mass. 1921); *In re Opinion of the Justices*, 46 N.E. 118 (1897).

---

[6] In the discussion of the proposal which later became § 1 of Article VI of the Constitution, delegate Polanco Abreu stated that the purpose of the committee was to continue the same municipal system that prevailed at that time, "to continue the same municipal system which is actually in force." Journal of Proceedings of the Constitutional Convention, p. 761.

An examination of the different laws approved for the municipal system shows that until 1955, date on which the Committee for the Settlement of Municipal Complaints was created, the power to impeach the mayor was granted to the Governor. (Act of March 1, 1902, Sess. Laws, p. 218; § 35, Act of March 8, 1906, Sess. Laws, p. 107; § 29, Act No. 11 of June 25, 1924, Sp. Sess. Laws, p. 76; § 29, Act No. 92 of August 22, 1925, Sess. Laws, p. 684) or to the municipal assembly (§ 26, Act No. 85 of July 31, 1919, Sess. Laws, p. 684; § 26, Act No. 60 of July 12, 1921, Sess. Laws, p. 436; § 29, Act No. 92 of August 22, 1925, Sess. Laws, p. 684)— if the Governor did not act within 20 days—(§ 29, Act No. 53 of April 28, 1928, Sess. Laws, p. 334).

██ The law which created the Committee for the Settlement of Municipal Complaints constitutes an exercise by the Legislature of the power which was granted to it by virtue of § 1, Art. VI of the Constitution "to create, abolish, consolidate and reorganize municipalities; to change their territorial limits; to determine *their organization and functions.*"

The errors assigned not having been committed and the removal of respondent by the Committee for the Settlement of Municipal Complaints being justified, the writ issued will be quashed.

## APPENDIX "A"

FINDINGS OF FACT OF THE COMMITTEE FOR THE SETTLEMENT OF MUNICIPAL COMPLAINTS IN CASE NO. 1: LUIS MUÑOZ MARÍN, GOVERNOR OF PUERTO RICO, PETITIONER, *v.* EDELMIRO RODRÍGUEZ RIVERA, MAYOR OF AIBONITO, RESPONDENT

"The Committee has made a careful and minute examination of all the oral and documentary evidence presented by the parties in this case and from the careful study of the same reaches the conclusion that the following facts have been proved:

"1—Edelmiro Rodríguez Rivera was elected mayor of Aibonito for the first time in the general elections held on November 7, 1944 and was consecutively re-elected on November 2, 1948, November 4, 1952, and *November 6, 1956.*

"2—Toward the end of 1952, respondent, *acting as mayor of Aibonito,* personally procured before the Housing Authority of Puerto Rico, the cession, *for purposes of public use,* of the salvage materials left over from the demolition that said agency planned to carry out in the ward of El Coquí in Aibonito, as part of its program to eliminate slums.

"3—As part of the above-mentioned steps respondent held several interviews with Mr. Emilio Serra, who held the office of Executive Director of the Housing Authority of Puerto Rico, and during said interviews Mr. Serra

told respondent that the petition for the surplus materials from the demolition of the ward of El Coquí could be granted as long as they were *used for works of public interest.*

"4—On December 6, 1952, respondent, *acting as mayor of Aibonito,* and according to the interviews held with Mr. Serra, sent the latter a letter officially requesting 'the usable timber from the ward El Coquí' which the Housing Authority proposed to eliminate as slum in Aibonito, and informing the Housing Authority that it was petitioner's intention to 'erect free distribution centers of milk in the wards of this municipality and a community center at the Torres Project of the Housing Authority in this town,' in which 'the surplus timber from the houses to be demolished would be a great help.' (Petitioner's Exhibit No. 3.) The aforesaid letter of respondent was answered by Mr. Emilio Serra, Assistant Executive Director of the Housing Authority, in a letter dated January 20, 1953, addressed to respondent *as mayor of Aibonito,* in which he informed the latter that the Authority would be willing to recommend the approval of the former request to the Housing and Home Finance Agency, *provided the Municipal Government of Aibonito agreed to the following:*

'1—use the salvage materials for a purpose of public interest such as proposed in your letter;

'2—dispose of the left overs, or unused materials, by fire, or by other methods; in other words, that no profit is to be obtained from the materials except *for direct public use;*

'3—*the municipality, of its own account and under its own responsibility,* shall pick from the site and transport for its use, or to be destroyed, the materials in question;

'4—the *municipality* shall save the Authority from any claims, or damages, in connection with the handling and use of these materials from the site and transported to the place where they are to be used, or disposed of.' (Petitioner's Exhibit No. 4.)

"5—Mr. Serra's letter to respondent closed with a notice that if he accepted the conditions written therein, he should submit an official petition as soon as possible.

"6—On January 26, 1953, respondent signed and delivered, *as mayor of Aibonito,* the letter that Mr. Emilio Serra had prepared, at respondent's own request, in answer to his letter. In said letter respondent made an official request that the salvage materials left over from the demolition of the ward of El Coquí be ceded to him and bound himself to the following:

'If these salvage materials *are given to the municipal government the municipal government pledges* in lieu of the value of the said materials to pick up them from the demolition site; transport them away from the site for using whatever part of them is usable in the completion of a community center for public use which the municipality proposes to build; for erecting temporary free distribution centers of milk to children of the poor; and to dispose of the left overs by fire, or by other methods.' (Petitioner's party Exhibit No. 5.)

"7—On February 10 of that same year Mr. Emilio Serra sent a letter to respondent, *as mayor of Aibonito,* acknowledging receipt of his letter of the previous January 26, and informing him that the Authority 'has no objection whatever that *the Municipality of Aibonito make use of all the salvage value'* of the buildings to be demolished within the area known as El Coquí, 'provided the following terms were observed and complied with:

'(a) All unused material must be destroyed preferably burnt;

'(b) After collecting all usable and unusable materials from the area, it should be left completely free of waste;

'(c) The Authority does not assume responsibility for any accident which migh occur to any person who works in the collection and transportation of said materials.' (Petitioner's Exhibit No. 6.)

"8—On January 13, 1953 the Housing Authority began the demolition of the houses of the ward of El Coquí, which

constituted a slum area that the Authority proposed to eliminate as part of its urban renewal program.

"During the first weeks of the demolition the Housing Authority took care of transporting the surplus material and storing it in a place for that purpose within the project area. Afterwards, in March or April 1953, the Authority finished its work disposing of all surplus and transporting the same, and *the Municipality of Aibonito* took charge of the disposal of the salvage materials from the demolition of the buildings and of cleaning up the site demolished.

"9—The demolition process took several months and a total of 127 structures were demolished at the ward of El Coquí. The salvage material from said demolitions *became property of the Municipality of Aibonito as agreed between the respondent mayor and the director of the Housing Authority.*

"10—No record was kept of the salvage material left from the demolition of the houses at the ward of El Coquí nor was any entry made in the accounting books of the municipality as to said materials or their value.

"11—Mayor Edelmiro Rodríguez Rivera sold materials left over from the demolished houses at the ward of El Coquí to the people whose names are listed below, as well as the materials they bought and the price paid for each one:

| | | |
|---|---|---|
| 1. Tomás Gutiérrez—used lumber, paid by check (Petitioner's Exhibit 8) | $ 60 | |
| 2. Ramón Antonio Santiago—pieces of zinc | $ 27 | |
| 3. Rafael Rivera—pieces of zinc | $ 27 | |
| 4. Luis Alvarado—wood panels $5 remained due | $ 70 | |
| 5. Juan Negrón Colón—used lumber and corrugated zinc | $225 | |
| 6. Juan Bautista Rivera Rodríguez—used zinc | $ 23 | |
| 7. Juanita Rosado Dávila—used materials | $200 | |
| 8. María González Rivera, alias Lalín—used materials | $ 90 | |
| 9. Francisco Berríos Cabrera—used piping | $ 31 | |
| 10. Eladio Rivera Rodríguez—used zinc | $ 90 | |
| 11. Ramón Antonio Colón—used materials | $ 75 | |

12. Francisco Benítez León—pieces of zinc
and a toilet $ 36
13. Julio Matos—used materials $ 40
14. Sergio Martínez Colón—used materials $125
15. José Morales Hernández—used materials $160
16. Alberto Muñoz Rosado—used materials $150
17. Genaro Berríos Colón—water pipes $ 20
18. Pedro Cartagena González, alias La Jarea
—zinc plates $ 11
19. Rafael Rivera Rivera—used flat zinc $ 17. 50
20. Juan Irizarry Irizarry—zinc plates $ 20
21. Máximo Martínez Mendoza—used ma-
terials $175

 $1, 677. 50

"12—The majority of the sales of the materials listed in the paragraphs above were effected personally by respondent and he received the cash payments. Some of said sales were made by respondent through Nicasio Fernández, cleaning foreman of the Municipality of Aibonito, but the proceeds of these sales were also delivered to respondent.

"13—The respondent mayor donated salvage materials from the houses demolished at the ward of El Coquí to the people whose names are listed below, to many of whom he also made gifts in cash together with the materials:

1. Dr. Francisco José Benliza Moya, doctor of
the Municipal Charity of Aibonito—15 or
20 zinc plates and lumber, 12 or 15 pieces
to build a garage at his house
2. Nicasio Fernández—some timber
3. Gil López Ortiz—old timber and $ 50
4. Eduvigis Rivera Robles—timber from 4
houses and $ 75
5. Julia Colón Berríos—a demolished house
and $ 50
6. José Díaz Nieves—a demolished house and $ 25
7. Tomás Rosario Franco—used timber and $ 75
8. Luis Rivera Rivera—in order that he com-
plete the full purchase price of a house $ 60
9. Eduardo Mercado Ortiz—timber to con-
struct houses for Saturna widow of Con-

cepción, Fernando Rolón, Virgilio Cortés, Ramona Díaz, and Catalina Díaz at La Plata Ward, and for nails and materials for said houses ... $ 60

10. Ramona Cortés Rivera—3 demolished houses and ... $ 25
11. Julia Meléndez—cook of the Municipal Hospital of Aibonito—a demolished house and ... $ 60
12. Felícita Cruz—Hospital Employee—two demolished houses and ... $100
13. Pedro Ortiz—husband of one of the employees of the school lunch-room of Aibonito—two demolished houses and ... $ 50
14. Luis Martínez González—janitor of the high school—two demolished houses and ... $ 50
15. Máximo González—two demolished houses and ... $ 37
16. Juan Molina Miranda—two houses and ... $ 50
17. Ramona Santiago Valladares — two demolished small houses and ... $ 60
18. Aguedo Colón Rodríguez—used material and ... $ 60
19. Ramón Colón Rodríguez—two demolished houses and ... $ 65
20. Liberato Torres Rolón—used timber and ... $ 50

$1,002

"14—In addition to the gifts to the people in the above-mentioned list, the respondent mayor gave salvage material from the demolition of El Coquí to the following persons:

(a) Eduardo Charriez, President of the Executive Committee of the parcel owners of the ward San Luis, was given surplus material from El Coquí and $196 in cash for the erection of a milk distribution center in the San Luis Ward on the parcel of Bartolo Ríos.

(b) Ricardo R. Vázquez—School Superintendent, surplus timber from El Coquí to restore the milk distribution center of the Cuyón ward, for the erection of milk distribution centers in the

wards of La Plata, Robles, and San Luis, for the construction of an addition to a schoolroom in the Caonillas ward, and the premises for the 'Progress of Childhood' cooperative in the Llanos Carretera ward.

(c) Manuel Colón—surplus material for milk distribution centers in the wards Hoyo Frío, Cuyón, Albarrobos, San Luis, El Pasto, and Robles, in addition to about $300 in cash to distribute among the workers who participated in said works.

"15—Respondent received payments in cash, amounting to $1,677.50 for the salvage material left from the demolition of the houses of the ward El Coquí, which he sold to the people listed in paragraph 11 and did not deposit any amount of said money in the municipal funds of Aibonito, nor did he give notice to the Secretary-Auditor or to the School Treasurer-Auditor, nor to the Municipal Assembly, nor to any other officer of said municipality, of having received said amounts, nor was any entry or registry of any kind made in the accounting books of the Municipality of Aibonito giving notice about the money that respondent personally received from the sale of such materials.

"16—Respondent did not give notice at any time to the Secretary-Auditor or to the School Treasurer Director of the Municipality, or to the Municipal Assembly, or to any officer of said municipality about the salvage material from the ward El Coquí, which had been granted to the Municipality of Aibonito, or about the use and disposal of the funds he received for the sale of part of the said materials.

"17—The gifts in cash, amounting to $1,498 which have been listed in paragraphs 13 and 14, were made by respondent directly and personally, without any amount of the funds used for said gifts having been entered in the records of the Municipality of Aibonito, and without any such gifts having been accounted for.

"18—The gifts of salvage material left from the demolition of the houses at the ward of El Coquí listed in paragraph 13, were also made directly and personally by respond-

ent without the intervention of any other officer of the Municipality of Aibonito and without any of such gifts having been accounted for.

"19—Respondent did not submit at any time any record to the Secretary-Auditor or to the School Treasurer Director of the Municipality of Aibonito, to the Municipal Assembly, or to any officer of said municipality, about the gifts made in cash or the building materials which have been listed in paragraphs 13 and 14." (Italics ours.)